UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| ANNA RUTH BRAY, and | ) | |
| LOIS BOONE, as Administratrix of the | ) | |
| Estate of Jimmie Lowe | ) | Civil No. 11-56-GFVT |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **&** |
| | ) | **ORDER** |
| JOHN HUSTED, M.D, | ) | |
| | ) | |
| LAKE CUMBERLAND REGIONAL | ) | |
| HOSPITAL, LLC, and | ) | |
| | ) | |
| LIFEPOINT OF LAKE CUMBERLAND, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Dr. John Husted seeks disqualification of Dr. Michel Gagner on the grounds that he "switched sides" in this case and is improperly testifying as an expert for the Plaintiffs, Anna Ruth Bray and the Estate of Jimmie Lowe, after having previously received work product and privileged material while serving as an expert for the defense. Bray and Lowe's Estate forcefully oppose striking Dr. Gagner, who is their standard of care and causation expert. They maintain that Dr. Husted never entered into a relationship with Dr. Gagner, who never reviewed any confidential information from Dr. Husted that could now be used against him. Having considered the arguments of the parties, Dr. Husted's Motion to Strike Plaintiffs' Expert Dr. Michel Gagner [R. 76] shall be **DENIED**.

I

Dr. Gagner performed the world's first laproscopic duodenal switch and is considered a pioneer in the procedure.  Therefore, when several plaintiffs brought claims against Dr. Husted for allegedly botching that procedure, it comes as no surprise that Dr. Husted would look to Dr. Gagner to provide expert opinions and testimony for his defense.  On December 6, 2010, Dr. Husted's counsel made initial contact with Dr. Gagner by email and attached letter[1]  to inquire about potentially reviewing the case of *Celesta Waddle v. Dr. John Husted*, a case proceeding in state court that is related to the instant action. [R. 76-2].  Dr. Gagner characterizes this letter as "very general" such that he "cannot tell anything about the case." [R. 82-3 at 52].   Dr. Gagner responded by email the same day he received the letter that, "I am interested in the case and I am willing to give you an honest opinion." [R. 76-3].  He requested that the case files be mailed to him as soon as possible so that he could conduct his review by the end of that month.  An email sent by Dr. Husted's representative in late December not only indicates that the materials had not been sent, but that Dr. Husted had not yet even authorized retention of Dr. Gagner.  The record does not contain further communication between Dr. Husted and Dr. Gagner for nearly two years.

But Dr. Husted was not the only party who knew of Dr. Gagner's prestige in preforming the procedure at issue.  During lengthy time between discussions with Dr. Husted, Dr. Gagner was contacted and retained by several of the plaintiffs asserting claims *against* Dr. Husted.  According to Dr. Gagner's deposition, by at least June of 2012, he received records from these

---

[1] The email is attached to Dr. Husted's motion at Exhibit B, but the content of the letter is omitted because Dr. Husted claims that it is work product.

2

plaintiffs.  [R. 82-3 at 57].  In July of 2012, Dr. Gagner participated in a conference call that included Aaron Reedy, counsel for Waddle, and Brian Schuette, counsel for Bray and Lowe's Estate.  [*Id*. at 12, 58-59].  This call lasted about an hour and involved a discussion of the materials those lawyers had sent him and that he had reviewed.  [*Id*. at 12-13].  In his deposition, Dr. Gagner claims that while reviewing these materials he assumed that it was the same materials he had been waiting to receive from Dr. Husted for the past 18 months.  [*Id*. at 24].  Thus, as for his part, it appears that Dr. Gagner was unaware at this point that he had been in contact with both sides of this litigation.

On August 27, 2012, after Dr. Husted had been retained by the plaintiffs and reviewed confidential information for them, Dr. Husted's counsel renewed contact with Dr. Gagner.  In that email, apparently the first since 2010, counsel began by stating, "I apologize for not keeping in contact with you."  [R. 76-5 at 2].  The letter went on to ask Dr. Gagner to confirm whether or not he was still interested in reviewing the files in the *Waddle* case, as well as the *Dixon* case, which also involved Dr. Husted.  Dr. Gagner responded that he remained interested in reviewing the case, and Dr. Husted's counsel forwarded him the case materials.  According to Dr. Husted's inventory, these materials included the pleadings, various medical documents, and the depositions that had been taken in the case.  [R. 76-6].  Dr. Husted specifically notes that the materials included a medical chronology and deposition summaries, which contained work product and privileged information.  Though these materials were specifically related to the *Dixon* case, due to the relationship among the Husted cases, the parties have agreed to "the sharing and utilization of discovery across case lines."  [R. 76 at 2].  Thus, the deposition of Dr. Husted that was summarized in the *Dixon* case and disclosed to Dr. Gagner, is the same

3

deposition that is being used in this case brought by Bray and Lowe's Estate.

Just a few days after the Dixon materials were sent, Dr. Gagner's wife and assistant called Dr. Husted's counsel to inform him that he would not be able to review the case. Though he did not provide an explanation at that time, in his subsequent deposition Dr. Gagner revealed that when he received the materials from Dr. Husted, he finally realized that he had been contacted by adverse parties in the same case. Testifying under oath at his deposition in the *Waddle* case, Dr. Gagner described what he did with the materials he received from Dr. Husted:

> I remember there was a box, a very sizable box on the table. I opened the top end to see a letter, and then I realized that the law firm was different and the cases – the case was – that the law firm was working in defense of Dr. Husted. It was then that I realized that it was the different Husted that I was thinking in my head. I closed the box and told my wife to call the firm and tell them to – that we can send the box back by UPS or FedEx, if the can give us the number, or destroy the file. And I was gone, on my way to Boston.

[R. 82-3]. Dr. Gagner went on to expressly state under oath that other than seeing the cover letter referencing Plaintiff Dixon's case, he did not review any of the materials provided by Dr. Husted and none of the information from the defense factored into the formulation of his opinions in this case.   [R. 82-3 at 61-63].

Though Dr. Gagner apprised the plaintiffs of these facts, he did not disclose to Dr. Husted the reason that he could not review the case for him. Having never received this explanation, Dr. Husted expresses that he was surprised when Bray and Lowe's Estate filed their expert disclosures in this case and Dr. Gagner was listed as an expert testifying on their behalf. Dr. Husted has responded by moving to disqualify Dr. Gagner as an expert in this case and at least one other. The Pulaski County Circuit Court had occasion to review the motion first, and, applying state law, refused to disqualify Dr. Gagner. Having reviewed the arguments of both

4

parties and the facts of the record, this Court now undertakes review of the same issue.

II

In the arms race that is retention of expert witnesses, a challenge has arisen wherein an expert has had some contact with one party before turning up in the final disclosures as the expert witness for that party's adversary in the same or related case.  This situation implicates the work-product doctrine, the attorney-client privilege, and conflict of interest ethical concerns, but is not accounted for in the Federal Rules of Civil Procedure, Rules of Ethical Conduct, or even Supreme Court or Sixth Circuit precedent.  Nonetheless, lower courts have somewhat uniformly adopted a singular approach for determining whether an expert must be disqualified for "switching sides," which will be useful in analyzing the instant issue.

A

In *Paul By & Through Paul v. Rawlings Sporting Goods Co.*, an opinion written by a magistrate judge in the Southern District of Ohio that has become the seminal case on the present issue, a manufacturer of baseball helmets, Rawlings, engaged in significant discussions with an expert in the field of testing baseball helmets, Dr. Goldberg.  123 F.R.D. 271, 273 (S.D. Ohio 1988).  Much of this discussion involved the development of testing procedures for their baseball helmets generally, but the parties did reference the case of Michael Paul, who had sued Rawlings from damage sustained during a baseball game while wearing a helmet manufactured by Rawlings.  At one point a representative of Rawlings even brought documents from the Paul case to a meeting, but Dr. Goldberg did not review them.  After discussions between Rawlings and Goldberg dissipated, Paul's representatives contacted Dr. Goldberg about testifying on behalf of the defense against Rawlings in their litigation, and Dr. Goldberg agreed.  Thereafter, Rawlings

5

sought to disqualify Dr. Goldberg from testifying in the case.

After noting that very little case law existed on this issue, the court began its analysis with the threshold questions of whether it had the power to disqualify an expert and, if so, from what authority does this power derive.  The court reasoned that it was endowed with power to disqualify an expert, "as part of the court's inherent power to preserve the public confidence in the fairness and integrity of the judicial proceedings."  *Id*. at 278.  Having reached this conclusion, the court declined to borrow principles from the attorney-client privilege context to make this determination.  Instead, the court relied on practical considerations in finding that:

> the proper focus in such situations is to determine, first, whether the attorney or client acted reasonably in assuming that a confidential or fiduciary relationship of some sort existed and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate.

*Id.*[2]

In applying that two-part test, the court asked three main questions:  (1) Did the expert witness enter into a relationship which gave rise to an objectively reasonable expectation on the part of the first party that it could disclose confidential information; (2) Did the first party actually disclose confidential information to the expert witness; and (3) Did the first party make a showing that the expert witness has used or may use such confidential information to the first

---

[2] Helpfully, the Court also explained the two-part test by stating it in the negative:

> if any disclosures of privileged or confidential material were undertaken without a reasonable expectation that they would be so maintained (so that, in effect, any confidentiality or privilege relating to the matters communicated was waived), or if, despite the existence of a relationship conducive to such disclosures, no disclosures of any significance were made, it would seem inappropriate for the court to dictate to the expert or his new employer that his participation in the case be limited or eliminated.

*Paul By & Through Paul*, 123 F.R.D. at 278.

party's disadvantage. *Id*. at 277. The court found that an important factor in making this determination is whether the moving party can show any "demonstrable prejudice," or that he was "unduly disadvantaged" by allowing the expert witness to testify under the circumstances. *Id*. at 280. Therefore, the essence of the test seems be the strength of the relationship between the first party and the expert witness. The strength of the relationship is determined by the belief of the parties as well as the amount and nature of confidential information that the expert witness accessed as a result of that relationship.

Under this test, the court found that, while Rawlings might have had a objectively reasonable belief that it had entered into a confidential relationship with Dr. Goldberg, disqualification required an affirmative showing of both parts of the test, and Rawlings had not proven that they had ever communicated matters of particular substance to Dr. Goldberg about the Paul case so as to unduly advantage Paul. Thus, while a relationship might have existed, the dearth of confidential information about the litigation that was disclosed showed it to be too tenuous and weak to merit the strong protection of disqualification.

Since *Paul* was decided, lower courts, and even as many as two circuit courts, have largely adopted its test and reasoning for determining whether to disqualify experts who have allegedly "switched sides." Kendall Coffey, *Inherent Judicial Authority and the Expert Disqualification Doctrine*, 56 Fla. L. Rev. 195, 210-11 (2004) ("This acceptance of the expert-disqualification doctrine by the Fifth Circuit, adoption by state courts and, in 1999, adoption in the Federal Circuit, indicates that it is safe to say that courts have adopted the *Paul* test."); *see, e.g*., *Koch Refining Co. v. Jennifer L. Boudreaux, MV*, 85 F.3d 1178, 1180-82 (5th Cir. 1996); *Nelson v. McCreary*, 694 A.2d 897, 903-04 (D.C. 1997); *Great Lakes Dredge & Dock Co. v.*

7

*Harnischfeger Corp*, 734 F. Supp. 334,338-39 (N.D. Ill. 1990); *Wang Laboratories, Inc. v. Toshiba Corp*., 762 F. Supp. 1246, 1247-1248 (E.D. Va. 1991); *Buckley v. City of Memphis*, 03-2874 DP, 2005 WL 6737964 at *2 (W.D. Tenn. Feb. 9, 2005).  To the extent later courts have expanded on this test, they have also endeavored to, "balance the competing policy objectives in determining expert disqualification," including protecting the integrity of the judicial process from conflict of interest and the ability of the parties to have access to expert witnesses of their choice.  *Cordy v. Sherwin-Williams Co*., 156 F.R.D. 575, 580 (D.N.J. 1994); *see also Topps Co., Inc. v. Productos Stani Sociedad Anomina Industrial y Commercial*, No. 99 Civ. 9437, 2001 WL 406193, at *2 (S.D.N.Y. Apr. 20, 2001); *Wang Laboratories*, F. Supp. at 1248.

Though not bound to the test articulated above, the Court does find the reasoning to be persuasive and appropriate to apply in this case.  Thus, under the prevailing approach, the Court may exercise its inherent powers[3] to disqualify Dr. Gagner if Dr. Husted has affirmatively shown[4] that:  (1) He had an objectively reasonable belief that a confidential relationship existed between him and Dr. Gagner; (2) He disclosed confidential or privileged information to Dr.

---

[3] At least in the context of civil matters, all federal district courts are empowered with the inherent authority to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc*., 501 U.S. 32, 40 (1991) (citing *Link v. Wabash R.R. Co*., 370 U.S. 626, 630-31 (1962)).  Due to the dearth of formal rules and procedures, a natural extension of this power is for the Court to provide some safeguards from any conflict of interest that might arise in the use of expert witnesses.

[4] From the test's inception in the *Paul* case, the burden has been on the party seeking disqualification to affirmatively show that all parts of the test are satisfied.  The *Paul* court explained the justification for so allocating this burden as follows:

> Of the two participants in an attorney-expert relationship, however, the attorney, being an expert in legal matters, should be more aware both of the potential for privileged information to pass to the expert, and for the need to insure against such information finding its way into the hands of an adversary. Consequently, I do not think it unfair to place the burden of making sure that the expert understands the type of relationship which exists, and the need to keep information disclosed during the course of that relationship confidential, on the attorney in the first instance.

*Paul By & Through Paul*, 123 F.R.D. at 279.

Gagner that may be reasonably used to his disadvantage; and (3) The competing policy objectives weigh in favor of disqualification.

B

The interactions between Dr. Gagner and Dr. Husted, which the latter claims to serve as the basis for disqualification, occur at two distinct times.  The first was in December of 2010 when Dr. Husted sent Dr. Gagner an unsolicited letter about retaining his services for the defense in the case of *Celesta Waddle v. Dr. John Husted*.  However, this interaction alone cannot serve as a basis for disqualification for several reasons.  First, at the time Dr. Husted transmitted his letter, which he claims contained work product, he could have had no objectively reasonable belief that he had a confidential relationship with Dr. Gagner.  In fact, the two had never met or had any preliminary discussions about the case.  For all Dr. Husted knew, at the time he sent the letter to Dr. Gagner, he had already been retained as an expert for the plaintiffs.  The ensuing email chain between the two does little more to show a confidential relationship between Dr. Husted and Dr. Gagner.  Though Dr. Gagner did say that he was interested in reviewing the case and requested the case file within the month, Dr. Husted's representative indicated that they could not go any further because, "we are waiting on retention authority from our client." [R. 76-3].  Thus, Dr. Husted's counsel as much as stated that they had entered into no relationship with Dr. Gagner at all.  Dr. Husted's actions seem to agree with this conclusion as he engaged in no further communication with Dr. Gagner for nearly two years.

Additionally, so far is ascertainable from the record, no confidential information was exchanged during this initial encounter.  Dr. Husted argues that the initial, unsolicited letter that he sent Dr. Gagner constituted work product and contained privileged information, making it

9

confidential communication that would likely have tainted Dr. Husted's opinion. However, in support of this argument, Dr. Husted has provided the Court with nothing more than his own bald characterization of the letter as work product. He did not undertake to describe the letter, tender the letter to the court under seal, or even counter the Plaintiffs' statement that Dr. Husted has chosen not to make the letter available for the Court to conduct an *in camera* review. Dr. Husted's unsupported characterization of the letter as work product cannot carry his burden in showing that confidential communications were exchanged.

This is especially true in light of the evidence in the record that suggests that the letter did not contain confidential information. First, at his deposition, Dr. Gagner re-read the letter in question and testified under oath that it was "very general" such that he "cannot tell anything about the case." [R. 82-3 at 52]. Additionally, Bray and Lowe's Estate tendered into the record an order from the Pulaski Circuit Court, which did have the opportunity to review the December 6, 2010 letter. In finding that the letter did not contain information sufficient to disqualify Dr. Gagner, Judge Tapp noted that the letter, "did not contain any mental impressions, conclusions, opinions, or legal theories." [R. 86-1 at 6]. While characterizing it as work product in the sense that it was prepared in advance of trial, Judge Tapp found that "no facts in the letter are privileged and they have all been plead or discovered." [*Id.*] Thus, not only has Dr. Husted failed to carry his burden in showing that confidential information was exchanged in this encounter, the evidence that is contained in the record suggests that the information exchanged was, in fact, not confidential information.

Finally, this initial encounter may not serve as the basis for disqualification because of the policy implications it would raise. As discussed, courts wrestling with this issue are often

concerned about the ability of parties to employ expert disqualification as a strategic tool against their adversaries.  If an expert may be disqualified simply by the act of receiving an unsolicited letter, parties are just a stamp away from divesting their adversaries of their choice of an expert witness.  The negative impact of such a rule would be especially felt in cases where there are a limited number of experts possessing the requisite specialized knowledge.  Thus, under the prevailing expert disqualification analysis, the initial communications between Dr. Husted and Dr. Gagner did not give rise to a need to strike the Plaintiffs' expert.

C

The subsequent communications between Dr. Gagner and Dr. Husted occurred nearly two years later.  On August 27, 2012, Dr. Husted's representative again reached out to Dr. Gagner to inquire about reviewing his case.  Notably, two things were different this time.  First, while Dr. Husted's counsel was seeking client approval, the Plaintiffs retained the available[5] Dr. Gagner, who reviewed confidential information on their behalf.  Thus, while Dr. Husted frames this case in terms of Bray and Lowe's Estate interfering with his expert, in a very real way, the facts suggest the reverse is more accurate – when Dr. Husted contacted Dr. Gagner in 2012, he was interfering with the Plaintiffs' expert.  In fact, at this point, had Dr. Gagner actually chosen to serve as an expert for Dr. Husted in this case, the Plaintiffs would have had a much stronger argument for disqualification than the one presently expressed by Dr. Husted.

Second, when Dr. Husted's representative contacted Dr. Gagner in 2012, she indicated

---

[5] It is critical to remember that at this point, as explained in the previous section, there was no relationship of any kind between Dr. Gagner and Dr. Husted.  At the abrupt conclusion of his of his first set of discussions with Dr. Husted, Dr. Gagner was available and free to consult for whomever he wanted.  As a policy matter, it would certainly not be fair that Dr. Husted's limited and inconclusive communication with Dr. Gagner would handcuff him into waiting years to see whether Dr. Husted ever received client approval to retain his services rather than accepting a formal offer from another party.  Such a rule would be harmful to experts and parties alike.

11

that this time she finally had client approval and the case documents were ready to be sent if Dr. Gagner were still willing to review them.  It is true that the record does not demonstrate a formal written agreement between them, but when Dr. Gagner responds that he is willing to review the case and provides shipping information to receive the case materials, it would have been objectively reasonable for Dr. Husted to conclude that Dr. Gagner had entered a confidential relationship with him.

However, the mere presence of an objectively reasonable belief that a confidential relationship exists is insufficient to merit or even create a presumption of disqualification.  Dr. Husted must also show that, "the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate."  *Paul By & Through Paul*, 123 F.R.D. at 278.  This involves proving that the Dr. Husted actually did disclose confidential information to Dr. Ganger such that allowing to Dr. Gagner to testify would provide the Plaintiffs with an unfair advantage and result in undue prejudice to Dr. Husted.

Dr. Husted can make no showing beyond the fact that he sent and Dr. Gagner received a box containing materials about the case.  Whether or not this box contained any confidential information, however, is irrelevant in this case because the consistent and uncontroverted testimony of Dr. Gagner is that he did not review any of it.  According to his deposition, upon opening the box and noticing from the letter that it was not from the Plaintiffs with whom he had been previously working, he closed the box and did not review any of its contents.  Instead, he instructed his wife to call Dr. Husted's counsel and indicate that he could no longer work on the case and would destroy the file, which he did.  Dr. Husted comes forward with no evidence that Dr. Gagner ever reviewed any of the materials that he sent him about his case.  In contrast, Dr.

12

Gagner has consistently maintained that he did not review the case materials sent by Dr. Husted and did not rely on them in any way in formulating his opinions.  If Dr. Gagner never reviewed any confidential communications from Dr. Husted before expressly terminating any relationship between the two, it cannot be said that Dr. Gagner may use that confidential information on behalf of the Plaintiffs in a way that would prejudice or unduly disadvantage Dr. Husted.  Thus, any relationship between Dr. Husted and Dr. Gagner was too tenuous and weak to merit disqualification.

This conclusion is supported by public policy.  The mere receipt of allegedly confidential information by an expert does not so taint the judicial process so as to require exclusion when the consistent and uncontroverted evidence of the record indicates that the expert did not ever review that information.  To an objective observer, these circumstances do not give off the appearance of impropriety, but of an honest mistake by a non-lawyer that was easily made under the circumstances. That is to say, with the abrupt termination of communication by Dr. Husted and the many and varied cases simultaneously existing against Dr. Husted at the present time, some confusion on the part of Dr. Gagner is understandable.  Additionally, Dr. Gagner, as the man who first performed the procedure at issue in this claim, is a highly desirable witness, even if he did not possess confidential information from the opponent.  As such, some weight must be given to a party's choice of this expert.  Therefore, balancing these policy considerations, disqualification of Dr. Gagner is not required.

In summary, though a confidential relationship may have ultimately developed between Dr. Husted and Dr. Gagner, the evidence of the record indicates that Dr. Gagner never reviewed any confidential communication from Dr. Husted.  Thus, Dr. Gagner did not emerge from his

interactions with Dr. Husted with any confidential information that could prejudice or unduly disadvantage Dr. Husted if Dr. Gagner were to serve as an expert witness for Bray and Lowe's Estate.  As such, the Court need not take the extraordinary action of exercising its implied powers to disqualify or strike Dr. Gagner from this action.[6]

D

Dr. Husted raises one additional contention that merits consideration of the Court.  Dr. Husted claims that the cases cited herein are irrelevant because they only reference the work-product privilege, not the attorney-client privilege, which he argues is also implicated in this matter.   Because attorney-client privilege is involved in this case, Dr. Husted believes the Court should to focus on Kentucky state case law, which would result in the disqualification of Dr. Gagner.  The Court rejects this conclusion for several reasons.  First, Dr. Husted is unable to point to any information reviewed by Dr. Gagner that could be classified as protected by the attorney-client privilege.  As a result, this case is directly online with *Paul*, wherein the court actively considered whether any of the disclosed information was protected by the attorney-client privilege and determined that it was not.   *Paul By & Through Paul.*, 123 F.R.D. at 279 ("One of the reasons I conclude the relationship between the two was not particularly strong as it relates to the *Michael Paul* case is the lack of communication of any information of either particular significance or which can be readily identified as either attorney work product or within the scope of the attorney-client privilege.").

Additionally, even if the case were governed by Kentucky state case law as Dr. Husted

---

[6] The Court does note, however, that nothing in this conclusion should suggest that the Plaintiffs may get to trial and question Dr. Gagner in such a manner as to suggest to the jury that he had the opportunity to review the case for Dr. Husted, but finding that he breached the standard of care, he switched sides in the name of truth and justice.  This

14

suggests, this Court agrees with the Pulaski County Circuit Court that disqualification is not required under that analysis either.   Dr. Husted argued to this Court and the Pulaski County Circuit Court that the controlling case in this matter is *Sowders v. Lewis*, 241 S.W.3d 319 (Ky. 2007).  In *Sowders*, an attorney for the plaintiff asked fellow attorney Paul A. Casi to serve as his co-counsel, providing him with work product on the case.  Before agreeing, Casi submitted the work product to Dr. Bonnarens, who opined that there was no breach of the standard of care. Thus, Casi opted not to serve as co-counsel for the plaintiff.  Subsequently, counsel for the defendant contacted Dr. Bonnarens to serve as an expert for him in the same case.  During the course of their conversations, Dr. Bonnarens admitted that he had reviewed the case for Casi. The plaintiff moved to disqualify Dr. Bonnarens from testifying.

The Kentucky Supreme Court found that "the attorney-client privilege attached to any confidential communications between Casi and Dr. Bonnarens." *Id*. at 322.  The court explained that though Dr. Bonnarens later testified that he had not reviewed attorney work product or any case files at all, this contradicted both his previous statements under oath that he had reviewed the case and the sworn statement of Casi, who testified that he had received a professional opinion from Dr. Bonnarens based on the work product he provided him.  In disqualifying Dr. Bonnarens, the Kentucky Supreme Court stated, "[a] simple finding that the expert did review the case for the opposing party and gave an opinion is sufficient. No one disputes that this occurred here." *Id*. at 323.[7]

---

would be contrary to facts as set forth by Plaintiffs and would be potentially unduly prejudicial to Dr. Husted.

[7] It is troubling to the Court that Dr. Husted chose to replace this important quote from *Sowders* with the following inaccurate paraphrase: "Rather, the fact that the expert had been provided work-product materials was sufficient." [R. 76 at 5].   The opinion is clear that, regardless of the specific documents he had access to, Dr. Bonnarens had previously reviewed and formulated an opinion about the case for a party he now opposed.  It was those facts, which are clearly not present in this case, that the Court found sufficient to support disqualification.

Though the analysis in *Sowders* is not necessarily inconsistent with that detailed above, the facts of *Sowders* are markedly different than this case.  In *Sowders* no one disputed that Dr. Bonnarens reviewed the case and issued an opinion about it.  Here, the facts of the record suggest just the opposite.  Though Dr. Gagner received potentially privileged information about the case, he did not review it or give an opinion on it for Dr. Husted.  Unlike the similar claims made by Dr. Bonnarens, Dr. Gagner's statements that he did not review any confidential information are consistent and uncontroverted by the evidence in the record.  The only information provided by Dr. Husted and reviewed by Dr. Gagner was the unsolicited December 6, 2010 letter, which is not in this record and was characterized by both Dr. Gagner and the Pulaski Circuit Court as general and providing no information about the case that was not also in the pleadings or discoverable.  Thus, this case is distinguishable from *Sowders*, and even when the analysis employed by the Kentucky Supreme Court is applied to this case, disqualification of Dr. Gagner is still inappropriate.

## III

Dr. Gagner did not switch sides in this case.  Rather, when Dr. Husted hesitated in securing Dr. Gagner's services, Bray and Lowe's Estate simply retained him first.  Subsequently, Dr. Husted and Dr. Gagner may have entered into a tenuous confidential relationship; however, before Dr. Gagner reviewed any confidential information from Dr. Husted, he realized his mistake and terminated that relationship.  As a result, Dr. Husted might have lost a good expert, but otherwise, no harm was done.   Accordingly, for the aforementioned reasons, it is hereby **ORDERED** as follows:

16

      (1)     Plaintiffs' Motion for Leave to Supplement Response to Motion to Disqualify [R. 86] is **GRANTED**; and

      (2)     Dr. Husted's Motion to Strike Plaintiffs' Expert Dr. Michel Gagner [R. 76] is **DENIED**;

This 21st day of November, 2013.

Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**

17