UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT LONDON

| | |
|---|---|
| ANNA RUTH BRAY, and<br>ESTATE OF JIMMIE LOWE,<br><br>    Plaintiff,<br><br>V.<br><br>JOHN HUSTED, M.D. et al.,<br><br>    Defendants. | CIVIL ACTION NO. 6:11-56-KKC<br><br><br>**OPINION & ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on two motions for summary judgment filed by Defendant John Husted. The two motions are nearly identical and seek dismissal of all claims brought by Plaintiffs Anna Ruth Bray (DE 90) and Lois Boone, administratrix of the Estate of Jimmie Lowe (DE 91), on the grounds that their claims are barred by the statute of limitations. For the following reasons, the Court will deny the defendant's motions.

Both plaintiffs in this case suffered from lifelong morbid obesity and sought medical treatment from John Husted, a bariatric surgeon in Somerset, Kentucky. According to the complaint, Anna Ruth Bray and Jimmie Lowe underwent what is known as a "duodenal switch" procedure that resulted in severe complications, including life-threatening malnutrition. After several months of medical treatment following their surgeries, both Bray and Lowe met Dr. Jeffrey Allen, who performed an exploratory and revisionary surgery on them to diagnose and correct the problems with Husted's prior work.

They filed their suit against Husted on February 14, 2011. Husted contends that the filings were untimely as they were filed more than a year after any reasonable person would have discovered her injury. He moves for dismissal on such grounds.

**I.**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In making its determination, courts must view all of the evidence in the light most favorable to the party opposing summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Where, as in this case, summary judgment [is sought] on statute-of-limitations grounds," the Court "must determine whether (1) the statute of limitations has run and (2) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action accrued." *Campbell v. Grand Trunk W. R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). If the court can resolve whether the statute of limitations has expired as a matter of law, it should. *See Elam v. Menzies*, 594 F.3d 463, 467 (6th Cir. 2010). "Kentucky law and federal procedural law used in diversity cases specify that disputed issues of fact respecting the running of a statute of limitations should be resolved by a jury." *Id.*

In this case, both parties agree that the statute of limitations is set by Ky. Rev. Stat. § 413.140(1)(e). Under this statute, claims for medical malpractice must be brought within one year of accrual. This statute adopts a discovery rule, which states that "the cause of action shall be deemed to accrue at the time the injury is first discovered, or in the exercise of reasonable care should have been discovered." K.R.S. § 413.140(2). Knowledge of the existence of one's claim is the statute's trigger, and it has two facets. "One must know: (1)

he has been wronged; and, (2) by whom the wrong has been committed." *Wiseman v. Alliant Hosps., Inc.*, 37 S.W.3d 709, 712 (Ky. 2000). Thus, in considering a motion for summary judgment under this statute of limitations, the Court must decide whether the evidence construed in the light most favorable to the plaintiffs indicates that Bray and Lowe knew or should have known they had been injured by Husted more than one year prior to filing suit on February 14, 2011.

II.

**A. Motion for Summary Judgment against Bray**

Bray began experiencing difficulties before she left the hospital after her surgery on May 26, 2009. No one disputes that she immediately suffered from complications: she required three different corrective surgeries and spent seventeen days in a medically-induced coma before ever leaving the hospital. (Linda Daviess Depo., 81-5, 34:7–35:7). According to the testimony of Bray's sister-in-law, Husted believed that Bray had a leak that needed surgical correction. (Daviess Depo., DE 81-5, 32:23–33:1). Because of the serious complications arising after her surgery, Bray was not discharged until August 20, 2009—nearly three months following the date of her initial procedure. When she was finally discharged, Bray was in a wheelchair, using a feeding tube, and unable to control her bowels.

After being discharged, Bray "continu[ed] to go downhill." (Bray Depo. II, DE 81-9, 119:7–15). She described being sick and nauseated, frequently vomiting, and having to wear diapers. (Bray Depo. II, DE 83-9, 115:24–116:1–6). Moreover, Bray continued to seek medical treatment, taking several trips to Southern Kentucky Rehab and the Centennial Medical Center in Bowling Green. On October 10, 2009, Bray was admitted to Centennial Medical Center but told that "they would not clean up any more of [Husted's] messes and

they could not touch [Bray], that [she] would have to go elsewhere." (Bray Depo., DE 81-9, 129:15–20). During this period, Bray testified that she "wouldn't have went back to [Husted] for nothing" because she knew something had gone "[h]orribly wrong" with her surgery. (Bray Depo. II, DE 81-9, 120:21–122:8). She was "scared to go back." (Bray Depo. II, DE 81-9, 121:25).

Finally, Bray sought treatment from Dr. Jeffrey Allen in January of 2009. During December of 2009, she claims she felt like she hit "rock bottom" and that she was "so weak" that she was "almost nonexistent." (Bray Depo. II, DE 81-9, 123:21–124:4. She had her first appointment with Dr. Allen on January 6, 2010. Bray testified that Dr. Allen could not determine what was wrong without performing an exploratory surgery, but that she was not healthy enough to undergo the procedure. (Bray Depo. II, DE 81-9, 144:1–10). He then discharged her to a nursing home to build up her strength for surgery. Bray stayed at the nursing home for thirty days before being discharged to home while she awaited surgery. On April 6, 2010, Allen performed an exploratory laparotomy and revision of Bray's duodenal switch. After this surgery, Allen informed Bray's family that Husted had made a "mess" during her surgery and described how Husted had removed too much of her common channel. (Bray Depo. II, DE 81-9, 192:2–193:22). Bray was eventually discharged from the hospital, removed her feeding tube in July of 2010, and starting eating regular foods and walking short distances.

Under Kentucky law, actions brought "against a physician [or] surgeon . . . for negligence or malpractice" are subject to a one-year statute of limitations. K.R.S. § 413.140(1)(e). The "cause of action shall be deemed to accrue at the time the injury is *first discovered* or in the exercise of reasonable care *should have been discovered*." K.R.S. § 413.140(2) (emphasis added). The latter of these two provisions is what Kentucky courts

refer to as the "discovery rule," and has been explained by the Kentucky Supreme Court as follows: "[T]he statute begins to run on the date of the discovery of the injury, or from the date it should, in the exercise of ordinary care and diligence, have been discovered." *Wiseman*, 37 S.W.3d at 712. Pursuant to *Wiseman*, "[t]he knowledge necessary to trigger the statute is two-pronged; one must know: (1) he has been wronged; and, (2) by whom the wrong has been committed." *Id*. Importantly, the Kentucky Supreme Court emphasized that "[t]his rule entails knowledge that a plaintiff has a basis for a claim before the statute of limitations begins to run," and plaintiffs "who possess[ ] no medical knowledge should not be held responsible for discovering an injury based on the wrongful act of a physician." *Id*. at 712–13.

A crucial aspect of the discovery rule is its reliance on the distinction between "harm" and "injury." In *Wiseman*, the plaintiff underwent a dilatation and curettage (D & C) procedure. Immediately after the surgery, the plaintiff began experiencing pain in her coccyx but was informed by the doctor that the surgery could not be the source of the pain. Over the next several years, the plaintiff continued to experience pain in her coccyx, and multiple physicians diagnosed her with a broken tailbone. Almost seven years after her initial D & C, the plaintiff developed a cyst that ultimately required surgery. During this surgery, the doctor "discovered a piece of a metal medical instrument, approximately three to four centimeters in length, located one-half inch to three-quarters inch under the surface of the skin." *Wiseman*, 37 S.W.3d at 711. It was later determined that this piece of metal was mistakenly left inside of the plaintiff during her D & C in 1989. *Id*.

The Kentucky Supreme Court in *Wiseman* rejected the argument that her claim— brought seven years after the initial surgery—was barred by the statute of limitations. The Court explained that although the plaintiff experienced *harm* immediately after her first

5

surgery, this "discovery of harm" was insufficient to start the limitations period. "Harm in the context of medical malpractice might be the loss of health following medical treatment," and "could result from a successful operation where a communicated, calculated risk simply turns out poorly for the patient, although the medical treatment met the highest medical standards." *Wiseman*, 37 S.W.3d at 712. Injury, on the other hand, is the "invasion of any legally protected interest of another," and in the context of medical malpractice "refers to the actual wrongdoing, *or the malpractice itself.*" *Id.* (emphasis added) (internal quotations omitted). Thus, although the plaintiff in *Wiseman* discovered her harm almost immediately, she could not have discovered her injury until the metal instrument was located inside of her.

Several courts have further elaborated on the distinction described in *Wiseman* in order to determine when a plaintiff's cause of action for medical malpractice begins to accrue. In *Vannoy v. Milum*, 171 S.W.3d 745 (Ky. Ct. App. 2005), the Kentucky Court of Appeals explained that knowledge of one's injury is not determined by whether the plaintiff knows her claim is *actionable*. *Id.* at 748–49. Thus, when a plaintiff was informed by other physicians that his injury was attributable *at least in part* to his doctor's antibiotic treatment, that knowledge was sufficient to start the statute of limitations period even though the plaintiff did not know that the doctor's specific act of negligence was a failure to prescribe the right dosage and properly monitor the plaintiff. *See id.* at 750.

Other cases within the Kentucky courts have offered less clarity. In *Welch v. Edds*, 2005 WL 3244339, Case No. 2004-CA-002255-MR (Ky. Ct. App. Dec. 2, 2005) (unpublished), the Kentucky Court of Appeals held that "[t]he discovery rule [ ] generally does not require expert confirmation that one has been wronged." *Id.* at *2. But the court was unclear as to what facts outside of expert confirmation might move the plaintiff from having only notice

6

of harm to notice of the "malpractice itself," which is required under *Wiseman*. In *Collins v. Jorjani*, 2004 WL 1909407, Case No. 2003-CA-001227-MR (Ky. Ct. App. Aug. 27 2004) (unpublished), the court found the plaintiff to have sufficient knowledge under the discovery rule because his injury was "readily apparent." *Id.* at *4. The plaintiff in *Collins* did not have an actual diagnosis to make him aware of his injury, but when seeking treatment from other physicians they informed him that his leg was not healing properly. *Id.* ("The doctors Collins consulted subsequent to Dr. Jorjani confirmed that his leg was not healing properly[.]"). Thus, while the *Collins* plaintiff did not have "expert confirmation" of malpractice through a specific diagnosis, he did have something more than an unsubstantiated experience of harm that would be otherwise insufficient. *See Wiseman*, 37 S.W.3d at 712–13 ("One who possesses no medical knowledge should not be held responsible for discovering an injury based on the wrongful act of a physician.").

In the instant case, whether Bray should be charged with knowledge of her injury is not easily discernible through examination of this case law. On the one hand, Bray has testified that she immediately believed that something had gone "horribly wrong" with her surgery. She had been informed she would leave the hospital the day following her surgery, but instead stayed for almost three months during which she underwent three additional surgeries and spent seventeen days in a medically-induced coma. When she finally left the hospital in August, Bray was in a wheelchair, on a feeding tube, and requiring diapers. By December, she had been informed by the Centennial Medical Center that they would not treat her because they would not be cleaning up any more of Husted's messes, and she described her situation as having hit rock bottom. She testified, without qualification, that she believed Husted did something wrong during the surgery.

7

That being said, when Bray finally met with Dr. Allen, he informed her that he could not determine what was wrong without performing an exploratory surgery. Although Allen might have *believed* her condition was due to Husted's procedure, he could not know the actual cause of her harm without performing an exploratory surgery. Moreover, none of the medical providers examining Bray between her discharge from Husted's care and her surgery with Dr. Allen informed Bray as to what the cause of harm was. This was despite persistent diligence on the part of Bray in attempting to discover what had happened. Bray contends that this makes her case like that in *Wiseman*: although she experienced harm immediately following her surgery, it was not until the following April that she discovered her actual injury.

Ultimately, this Court finds that whether Bray had the requisite knowledge under the discovery rule is a fact issue best reserved for trial. On a motion for summary judgment, this Court must construe all facts in a light most favorable to the non-moving party. There is no doubt that Bray experienced immense harm following her surgery, and believed that the harm had been caused by Husted during a surgery gone wrong. And unlike *Wiseman*, Bray's belief that Husted harmed her was never dislodged by a second physician's misdiagnosis. However, in seeking subsequent medical treatment, no other medical provider informed her as to what—if anything—went wrong with her surgery. According to the testimony, Dr. Allen informed her that he needed to perform an exploratory surgery in order to discover the cause of her harm. These facts ultimately give reasonable grounds to dispute the point in time that Bray knew or should have known she suffered an *injury*, rather than just the harmful consequences of an invasive medical procedure.

As explained in a related case, *Burton v. Lake Cumberland Reg. Hosp., LLC*, Civil No. 11-317 (E.D. Ky.), the facts of *Vannoy v. Milum* are illustrative. The Kentucky Court of

8

Appeals ultimately found in *Vannoy* that the plaintiff knew he had been injured and by whom before he knew he had an actionable claim for negligence. *Vannoy*, 171 S.W.3d at 750. Although Husted would contend that the case is similar to Bray's—that she knew she had been injured prior to Dr. Allen discovering the specific act of negligence—*Vannoy* is distinguishable in a crucial way. The plaintiff in *Vannoy* knew he had been injured and by whom only "upon obtaining his [medical] records," which attributed his harm in part to his gentamicin therapy. *Id.* at 749–50. In contrast, Bray sought medical treatment from a number of providers following her surgery and it was not until April 6, 2010, that her medical records attributed her harm to specific conduct by Husted. This distinction demonstrates why the fact of knowledge is in dispute in the present case: unlike *Vannoy*, it is not abundantly clear whether Bray "had in [her] hands all relevant facts" necessary to constitute knowledge of her injury.

As the Kentucky Court of Appeals has stated, "where 'there is a factual issue upon which the application of the statute [of limitations] depends, it is proper to submit the question to the jury.' As such, we note that it is not within the province of this [C]ourt to determine whether [the plaintiff] knew or should have known that he was" injured by Husted's malpractice. *Van Landingham v. Georgia-Pac. Corp.*, 2009 WL 2475258, *3, Case No. 2007-CA-002601-MR (Ky. Ct. App. Aug. 14, 2009) (unpublished). "Rather, a material issue of fact exists as to [her] knowledge or lack thereof, and such a determination is within the particular province of the jury." *Id*. In this case, whether Bray knew or should have known is a factual question, and the Court will therefore deny Husted's motion.

**B. Motion for Summary Judgment against Lowe**

The facts for Plaintiff Jimmie Lowe resemble that of Bray's with a few differences. Like Bray, Lowe sought medical treatment in 2009, undergoing her bariatric surgery on June 11,

2009. But unlike Bray, Lowe did not suffer from the same immediate difficulties. She was discharged from the hospital within only a few days. Once home, however, it became apparent that something was wrong. According to testimony of her mother-in-law Lois Boone, who brings the present action as the administratrix of Lowe's estate, Lowe was unable to eat or drink without vomiting or having diarrhea. (Boone Depo., DE 83-5, 35:6–8). When asked whether "you could tell that something was not right virtually from the day she came home from the hospital," Boone said, "Yeah." (Boone Depo., DE 83-5, 58:9–12). She also experienced respiratory difficulties for which she sought treatment at the Lake Cumberland Regional Hospital emergency room. During part of this period following the surgery, Lowe remained under the care of Husted. He performed a corrective surgery on Lowe after she developed a leak. The surgery was performed on July 24, 2009 and Lowe was discharged on August 1.

Brenda Overby, a friend and neighbor of Lowe's, testified in her deposition that when Lowe came home after her surgery Lowe told Overby she regretted her surgery and believed that Husted had lied to her. (Overby Depo., DE 83-10, 14:19–15:7). When asked whether Lowe told her this "within a matter of days or weeks after she got home," Overby said, "Probably within a month." (Overby Depo., DE 83-10, 15:3–5).

In October 2009, Lowe's condition deteriorated again and she was admitted to Saint Joseph London Hospital. (Boone Depo., DE 83-5, 44:5–45:6, 46:4–5). She stayed there for approximately a month where her condition continued to worsen, but nobody was able to determine what was wrong. (Boone Depo., 83-5, 45:7–10). While at Saint Joseph's, Lowe was told by the doctors that she "needed to find a weight loss doctor." (Boone Depo., 83-5, 47:10). Near the end of October, the family got in touch with Husted and was transferred back to Lake Cumberland under his care. (Boone Depo., 83-5, 48:16–49:6). Lowe was

discharged from Lake Cumberland on December 4, and at this point Boone testified that it was apparent that "[s]omething was really wrong." (Boone Depo., 83-5, 61:16–20).

Lowe continued to seek medical treatment throughout December. She first went to Oak Tree Hospital where she was under the care of Dr. Steve Morton. (Boone Depo., 83-5, 54:5–10). Then, at the end of December, Lowe was transferred to Baptist Regional Rehabilitation Center, where she stayed for approximately one month. (Boone Depo., 83-5, 55:25–56:14). Eventually, Lowe ended up just like Bray in the care of Dr. Allen, who admitted Lowe to Norton Suburban Hospital in April of 2010. After spending approximately six weeks in the hospital building up her strength, Allen performed the same exploratory surgery on May 11, 2010, where he discovered the same problem he found with Bray's surgery. (Boone Depo., 83-5, 64:20–65:16).

Importantly, and as was the case with Bray, the testimony indicates that Dr. Allen did not know—and could not know—what was wrong with Bray prior to the exploratory surgery. During her deposition, Boone was asked whether Dr. Allen told her "what he intended to -- to do in the surgery." (Boone Depo., 83-5, 65:6–7). She responded that "[h]e told me he wouldn't really know till he got in there to see what's going on." (Boone Depo., 83-5, 65:8–9). Following the surgery, however, Dr. Allen "told [Boone] her stomach or whatever part you take out was shortened." (Boone Depo., DE 83-5, 65:14–15).

The analysis here mirrors that applied to Bray. Just as with Bray, Lowe experienced difficulties soon after being discharged from the care of Husted. And just as with Bray, deposition testimony indicates that Lowe believed the surgery had gone wrong. But just as with Bray, Lowe was unable to determine how Husted committed malpractice until her exploratory surgery with Dr. Allen. Although she was diligent in seeking out answers, no medical provider was able to provide them until May of 2010. Not even Dr. Allen could

determine what was causing her harm without performing an exploratory surgery. Thus, although Lowe might have *believed* that Husted harmed her, when drawing all reasonable inferences from the evidence in favor of her, it is not clear that she had sufficient knowledge to satisfy Kentucky's discovery rule. As with the analysis above, when "a material issue of fact exists as to [her] knowledge or lack thereof, [ ] such a determination is within the particular province of the jury." *Van Landingham*, 2009 WL 2475258 at *3. For these reasons and the reasons explained above with reference to Bray, the Court will deny Husted's motion for summary judgment on the grounds that there is a genuine dispute over when Lowe knew or should have known she had been injured by Husted.

* * *

Accordingly, and for all of the reasons stated above, **IT IS ORDERED** that:

1. Defendant John Husted's motion for summary judgment (DE 90) against Plaintiff Anna Ruth Bray is **DENIED**; and

2. Defendant John Husted's motion for summary judgment (DE 91) against Plaintiff Lois Boone, as administratrix of the Estate of Jimmie Lowe, is **DENIED**.

Dated this 31st day of March, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY